**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 30 2013, 5:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Gary, Indiana

ATTORNEYS FOR APPELLEES:

**EUGENE M. VELAZCO, JR.**
DCS, Lake County Office
Gary, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

**DONALD W. WRUCK**
Wruck Paupore, PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| H.B., G.M., P.M. and A.C. (Minors), | ) | |
| | ) | |
| C.M. (Mother), | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1302-JT-62 |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CHILD SERVICES and LAKE COUNTY | ) | |
| COURT APPOINTED SPECIAL | ) | |
| ADVOCATE, | ) | |
| | ) | |
| Appellees-Petitioners. | ) | |

**September 30, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Respondent, C.M. (Mother), appeals the trial court's order terminating her parental rights to her minor children, H.B., G.M., P.M., and A.C. (Child or Children).

We affirm.

ISSUE

Mother raises one issue on appeal, which we restate as: Whether the trial court's decision to terminate Mother's parental rights is supported by clear and convincing evidence.

FACTS AND PROCEDURAL HISTORY

Mother and D.M. are the parents of P.M., born March 12, 2007, and G.M., born November 10, 2005. Mother and R.G. are the parents of H.B., born September 11, 2003. Mother and J.C. are the parents of A.C., born August 16, 2001.[1] Throughout these

---

[1] The trial court also terminated the parental rights of all three fathers. R.G. and J.C. did not participate in the termination hearing. D.M. participated in the hearing and filed a Notice of Appeal but did not perfect his appeal. We will only include the facts with respect to the Children's fathers as appropriate.

proceedings, Mother and D.M. were married, and H.B. and A.C. considered D.M. to be their father.

On July 23, 2008, the Lake County Department of Child Services (DCS) received a report that the Children were left unsupervised, and the home of Mother and D.M. had no working utilities. DCS investigated and found that the family used a propane tank to cook food outdoors and had been using an extension cord to obtain power from the neighbor to run the refrigerator. The Children were dirty, and the home was infested with fleas and flies, as well as strewn with dirty clothing and dishes, insect tape, and cigarette butts. DCS took the Children into custody but allowed them to remain with Mother so long as they did not stay in their home.

On July 24, 2008, the trial court declared each Child to be a Child in Need of Services (CHINS). The trial court directed Mother to "maintain suitable housing" and ordered DCS to provide services, including assisting Mother and D.M. obtain a waiver for utility services and providing psychological evaluations and treatment, therapy, and classes in parenting and homemaking skills. (Appellant's App. p. 8).

After DCS's initial visit, Mother and D.M. moved into the home of D.M.'s brother (Uncle) and Uncle's girlfriend, but on September 2, 2008, Mother informed DCS that Uncle had kicked them out of his house, and they had returned to their own home. Mother alleged that Uncle had been abusive toward two of the Children. That same day, DCS visited Mother's home and found no improvement. The Children had lice and insect bites, and A.C., who has blindness in one eye and poor vision in the other, had not

been attending school because she did not have glasses. DCS removed the Children and placed them in St. Joseph's Carmelite Home Holy Innocence Center (Carmelite Home).

The following day, September 3, 2008, the trial court conducted a disposition hearing and found that it would be contrary to the Children's welfare to be returned to Mother's custody. DCS set a goal of reunification. In December of 2008, Mother had completed parenting classes, received a psychological evaluation, complied with all court-ordered services, and remedied the problems at home to "the minimum sufficient level of care." (State's Ex. D p. 7). On December 10, 2008, DCS recommended that the Children begin trial home visits as Mother and D.M. had "successfully completed their case plan[,]" were "in compliance with all services[,]" and were "ready for their [C]hildren to return home." (State's Ex. F).

On April 3, 2009, DCS reported that Dismissal of Wardship would be in the Children's best interest. However, three days later on April 6, 2009, DCS learned that Mother and D.M. had been arrested for burglary. Mother was also suspected of child abuse due to allegations that she "choked [the neighbor's] child while dragging him across the room." (State's Ex. I). As both parents were detained in jail, DCS removed the Children and placed them in the Carmelite Home. Mother's charges were eventually dropped, and DCS resumed her services and supervised visitation.

On March 31, 2010, the Children were officially placed with their maternal grandmother (Grandmother) in Tennessee through an Interstate Compact on the Placement of Children. Mother also relocated to Tennessee to reside with Grandmother

and the Children and to look for employment. The Tennessee case worker had initial safety concerns about the home, which DCS addressed with Mother and Grandmother. In July of 2010, the landlord evicted the family because the house was dirty, garbage was piled up, and the rent and utility payments were delinquent. The family moved in August of 2010, but this house was also found to be dirty and full of cats.

In October of 2010, G.M. and P.M. swallowed some of Mother's prescription sleeping pills and were rushed to the hospital. They were kept one night for observation but were otherwise unharmed. DCS instructed Mother to keep her medicine locked up, and, after a home inspection, also instructed her to clean the kitchen.

In November 2010, Tennessee authorities took the Children into emergency custody. Mother had taken A.C. to the hospital, believing the Child might have been raped by Mother's friend, who had been staying in the home with the family. A physical exam did not reveal signs of rape, but there were sexually suggestive text messages on A.C.'s cell phone from the alleged perpetrator. Additionally, the Children were not regularly attending school. DCS retrieved the Children from Tennessee and returned them to the Carmelite Home. After Mother returned to Indiana, DCS resumed her visitation and services. Mother maintained her visitation, but she moved from house to house and missed service appointments. In December of 2010, due to Mother's non-compliance, DCS terminated all of her services except for visitation.

On January 27, 2011, DCS filed a Termination of Parental Rights Petition with respect to all four Children. In June 2011, after trial visitations, the Children were placed

in a foster home. Initially, the Children were all placed in the same home, but H.B. began having serious behavior issues. After H.B. had several violent outbursts directed against his foster mother (Foster Mother/Parents S) and siblings, DCS placed H.B. in respite and then assigned him to a new foster family (Foster Mother M). The other Children also had behavioral problems, including difficulties focusing in class and following directions, appropriately socializing with other students and adults, dealing with anger and anxiety, and engaging in conduct of a highly sexual nature.

In the fall of 2011, Mother moved to Wisconsin. On May 1, 2012, DCS ceased Mother's visitation with the Children because she continued to bring friends and boyfriends to the visits, despite DCS's instructions not to. Mother also missed a lot of visitations without calling, allegedly due to weather conditions or car problems.

On December 12, 2012 and January 23, 2013, the trial court conducted termination hearings. On January 29, 2013, the trial court granted DCS's petition to terminate Mother's parental rights.

Mother now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Mother contends that the trial court erred by terminating her parental rights to the Children. The Fourteenth Amendment of the United States Constitution protects a parent's fundamental interest in the custody and care of his or her children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). However, parental rights are subservient to the interests of the children, and termination is

appropriate "when the parents are unable or unwilling to meet their parental responsibilities." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010). Termination permanently severs the parent-child relationship; thus, it is an extreme sanction and should only be used when all other reasonable efforts have failed. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Accordingly, "[a] finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence." Ind. Code § 31-37-14-2. To satisfy its burden, DCS must prove:

> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

In determining whether clear and convincing evidence supports the trial court's order to terminate parental rights, this court does not reweigh the evidence or assess the credibility of witnesses. *In re D.J.*, 755 N.E.2d 679, 683 (Ind. Ct. App. 2001), *trans. denied*. In this case, Mother does not challenge the factual findings made by the trial court; therefore, we review to determine whether the findings support the trial court's judgment. *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence and reasonable inferences that support the judgment and will reverse only if the judgment is clearly erroneous. *Id.* at 1234-35. A

7

judgment is clearly erroneous if there are no facts or inferences to support it. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Mother claims that DCS did not prove by clear and convincing evidence: (I) a reasonable probability that *either* (A) the conditions resulting in the Children's removal will not be remedied, *or* (B) that the continuation of the parent-child relationship poses a threat to the Children's well-being; (II) that termination is in the Children's best interest; and (III) that DCS has established a satisfactory plan for the Children's care and treatment.

I.    *Conditions Leading to Removal Will Not Be Remedied or Continuation of the Parent-Child Relationship Poses a Threat to the Children's Well-Being*

Mother claims that the trial court erred in finding a reasonable probability that the conditions which warranted the Children's removal and continued placement outside the home will not be remedied. When evaluating whether there is such a probability, a trial court must assess the parent's fitness to care for the child at the time of the termination hearing, taking into account any evidence of changed conditions. *In re J.S.*, 906 N.E.2d 226, 232 (Ind. Ct. App. 2009). A parent's habitual pattern of conduct is indicative for determining the probability of future detrimental behavior. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). "DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In this case, the trial court found a reasonable probability that the conditions will not improve. The trial court identified the three failed attempts at reunification, the

8

length of time the Children have been removed, and Mother's chronic inability to maintain an appropriate home as crucial to its conclusion. Mother had ample time, opportunity, and assistance to remedy the conditions, and it is well-settled that a court does not have to wait for a child to become "irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired" before it can terminate the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). The record is replete with evidence that demonstrates the habitual nature of Mother's failure to maintain suitable living conditions. For instance, DCS was concerned that Mother did not appreciate the necessity of a clean, safe, and stable home:

> As far as like homemaker issues, she doesn't understand—her home and the way it should be and why it should be that way, because it continued even in Tennessee. She didn't have a home, she moved to, you know, Wisconsin, knowing that it could be an issue with her coming back and forth for visitations and then she didn't complete her services when she went to Wisconsin and they were stopped due to non-compliance from mom.

(Tr. p. 140).

However, Mother first argues that the trial court failed to consider "that [she] had completed her parenting classes, participated in years of visitation with her children, and currently has employment and suitable housing"—namely, that she "complied in totality with her case plan." (Appellant's Br. p. 12). We disagree. The trial court specifically found: "The parents initially seemed motivated and participated in the services. . . . The[y] continued to participate in services and in December 2008 the children were returned home. The parents were making progress and [DCS] was considering

9

dismissing the CHINS matters." (Appellant's App. p. 2). Then, "another set of issues arrived and warrant[ed] further treatment and services." (State's Ex. J p. 12). After the Children's third removal, DCS terminated Mother's services because of her non-compliance. Ultimately, however, the bearing of Mother's compliance with services on the trial court's conclusion is an issue of evidentiary weight, which is a matter left to the trial court's discretion. *In re J.S.*, 906 N.E.2d at 235.

Mother also asserts that she now has employment and suitable housing—a four bedroom trailer with her boyfriend in Wisconsin—and argues that she should not lose her rights just because it "did not happen fast enough to satisfy the DCS or the [c]ourt." (Appellant's Br. p. 7). It is established that "the time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination. The termination statutes do not require the court to give a parent additional time to meet his or her obligations." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007). By the time Mother obtained housing, a year had lapsed since DCS filed the petition to terminate her rights. Mother had numerous opportunities and nearly five years to demonstrate improvement and an ability to sustain the implementation of parenting and homemaking skills. Even after DCS removed the Children for the third time, the gravity of permanently losing custody still was not sufficient motivation for Mother to make every feasible effort to complete services. Mother's assertion that "[t]he continued destruction of the family structure should not be

10

tolerated by this [c]ourt" is ironic given that Mother forfeited all the time and resources that could have kept her family intact. (Appellant's Br. p. 14).

Second, Mother argues that the trial court erred by not recognizing, essentially, that her attempts to comply with DCS's case plan and remedy the Children's living situation were stymied by the actions of others. She points out that Uncle evicted them from his home and that she was merely a visitor in Grandmother's home in Tennessee with no control over its conditions. We first note the ineffectiveness of Mother's attempt to assign blame elsewhere for the fact that DCS had cause to remove the Children on three separate occasions. It was Mother's responsibility to ensure the Children were in a safe and healthy environment while in her care. *See Harradon v. Schlamadinger*, 913 N.E.2d 297, 302 (Ind. Ct. App. 2009) ("[P]ublic policy and common sense dictate that the duty to provide for a child's safety will usually rest with the child's parents while the child is in the parents' presence."), *trans. denied*. Second, the trial court did, in fact, consider these incidents in its findings, but it clearly did not regard them as favorable evidence of Mother's parenting skills. Thus, Mother has neither challenged the factual findings of the trial court, nor offered any citation to authority as to why the trial court erred. Instead, Mother's objection is a request of this court to reweigh the evidence, which we will not do. *In re J.S.*, 906 N.E.2d at 235.

Lastly, Mother contends that the trial court erred because it failed to consider the reason she missed so many visits with the Children was due to weather conditions in Wisconsin. With respect to her visitation, the trial court found:

11

Mother was not regularly visiting her children. Mother missed a lot of visits due to no-call, no shows. The lack of visitation was hurting the children. The mother would bring friends, different boyfriends to the visitation site when she did visit and was told not to on numerous occasions. Mother continued to bring the strange people and her visitations ceased in April 2012 due to the emotional harm it was causing the children due to mother's inconsistency. Mother moved to the State of Wisconsin and her children remained in the State of Indiana.

Thus, the trial court found that Mother's missed visits, regardless of the reason, were detrimental to the Children. The record contains evidence that supports the trial court's determination. For example, the Children's therapist, who also supervised visitation, made the following request to terminate Mother's visitation:

The children are having a difficult time when [M]other does not show up [for] visits and have a hard time understanding why she does not want to see them. This leaves them with feelings of hopelessness, abandonment, and confusion. [H.B.] is especially having [a] difficult time as he spends his time looking out the window for [M]other to show only for him to be left in disappointment.

[A.C., P.M., and G.M.] have regressed and tend to return to some old behaviors. [P.M. and G.M.] are having problems in school and are acting out aggressively. They have verbalized to this therapist that they feel their mother does not care about them anymore and do not understand why. [A.C.] has been exhibiting signs of increase in oppositional behaviors especially in visitations.

I am recommending that the visitation for [Mother] be stopped as this only traumatizes the children further when she chooses not to show. They need to be able to move forward in their life and have consistencies that they deserve.

(State's Ex. T p. 3). It is not the role of this court to reweigh evidence to give more credence to Mother's position that justifiable absences refute the trial court's finding that her pattern of instability is unlikely to be remedied.

12

Mother loves the Children, but affection is not commensurate with an ability to provide a clean, safe, and stable environment. Mother's pattern of conduct over the course of five years, including three failed attempts at reunification, supports the trial court's conclusion that the conditions which caused the removal will not be remedied. *See In re D.J.*, 755 N.E.2d at 685.[2]

## II. *The Children's Best Interest*

Mother claims that the trial court erred in finding that termination of her parental rights is in the Children's best interest. In determining whether termination is in a child's best interest, the trial court must consider the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The best interest of a child "is a subjective measure of what would most benefit the child in these particular circumstances." *In re B.D.J.*, 728 N.E.2d at 203 n.3. "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265.

In this case, the trial court determined that termination is in the best interest of the Children for the sake of "their health, welfare and future." Specifically, the trial court

---

[2] Because we conclude that the trial court did not err by finding a reasonable probability that the conditions will not be remedied, we do not need to address Mother's alternative argument that the trial court did not have sufficient evidence to find a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See Ind. Family & Soc. Servs. Admin. v. Amhealth (Evansville), Inc.*, 790 N.E.2d 162, 166 n.2 (Ind. Ct. App. 2003).

found that the Children need permanency and "a safe, clean, and stable environment." Furthermore, the trial court stated, "None of the parents are providing any emotional or financial support for the children. It is unlikely that any of the parents will ever be in a position to properly parent these children." (Appellant's App. p. 4). We agree that the trial court's findings clearly demonstrate Mother's "historical inability" to maintain adequate housing and supervision. *Lang*, 861 N.E.2d at 373. The Children have been wards of DCS since July 24, 2008, and Mother has not had visitation since April of 2012. The Children have spent the majority of their lives in the care of others.

Mother contends that the trial court erred in failing to consider the Children's "pain and suffering" over losing contact with their mother, and that "several parties testified that the children wanted to go home to their mother." (Appellant's Br. p. 13).[3] Although Mother does not identify which parties so testified or direct this court to testimony in the record, at the termination hearing, multiple witnesses testified that it would be in the Children's best interest if Mother's rights were terminated. The Children's therapist and visitation supervisor testified:

> Right now, I believe that the kids are so attached and so bonded with [Foster Parents S] that I think it would be very detrimental to pull them out of the home. And they would be re-traumatized . . . [Foster Parents S] have a support system, they have back-up . . . ."

> ****

---

[3] Mother also argued that the court failed to consider D.M.'s continued his visitation with the Children. This fact has no bearing on whether it is in the Children's best interest to be reunited with Mother. At the hearing, Mother and D.M. were no longer living together, D.M. was engaged to Uncle's former girlfriend, and D.M. and Mother planned to file for divorce. After D.M.'s release from prison, DCS developed a concurrent plan of reunification, which did not modify the plan to terminate Mother's rights.

[I]f something happens and they get pulled again, they are not going to have any trust in any adults. They are not going to have good relationships. They are going to have attachment issues. And right now, these kids are so bonded with the foster parents that I just think it would be very detrimental to them.

(Tr. pp. 206-08). One of the DCS case managers opined:

[Foster Mother S] does provide structure in the home, she has clear set boundaries, they have a home environment where they are comfortable to express themselves, but also understand what the consequences of their actions are going to be. Most importantly, they have an environment where it's okay for them to act out and they know that they are okay there. They are not going anywhere.

(Tr. p. 162). The Children's Court Appointed Special Advocate also concurred and stated that it would be in the Children's best interest for this court to affirm the trial court's order terminating Mother's parental rights.

We have "previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236). Based on the totality of the evidence, we find clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interest.

### III. *A Satisfactory Plan for the Children's Care and Treatment*

Although the trial court found that DCS's plan of adoption is a satisfactory plan for the care and treatment of the Children, Mother now claims that DCS's plan is not satisfactory but "is marginal at best." (Appellant's Br. p. 13). This court has held that a

plan for care and treatment is satisfactory, even if the particular details have not been finalized, "so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re B.D.J.*, 728 N.E.2d at 204. "[A]doption is a satisfactory plan." *In re A.K.*, 755 N.E.2d at 1098.

In this case, DCS has procured prospective adoptive parents. Foster Parents S intend to adopt A.C., P.M., and G.M. Foster Mother M stated that she is still willing to consider adoption of H.B., pending remediation of his behavioral concerns, and wants to remain his foster mother in the mean-time.

Despite Mother's contention that the "non-committal" agreement of Foster Mother M to adopt H.B. is not a satisfactory plan, the fact that DCS is pursuing adoption for H.B. is a sufficiently satisfactory plan—whether it is his current foster family or another that finalizes the adoption. *See In re D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. DCS maintains certain standards for the quality of foster and adoptive homes; thus, the issue of a satisfactory plan is not concerned with the particular placement, but rather with the fact that DCS has a goal in place to achieve permanency for the Children. *See In re D.J.*, 755 N.E.2d at 685. Mother also argues that DCS failed to meet its burden because the Children's behavioral struggles only arose after being placed in foster care, but the Children's therapist and case managers testified that the likely cause of the behavior problems is the numerous removals and placements the Children have endured. Accordingly, we find there is sufficient evidence to support the trial court's finding that DCS has a satisfactory plan for the Children's care and treatment.

16

## CONCLUSION

Based on the foregoing, we conclude that the DCS presented clear and convincing evidence to support the trial court's order to terminate Mother's parental rights to the Children.

Affirmed.

KIRSCH, J. and ROBB, C. J. concur

17